**Exhibit A**

**UNITED STATES PUBLIC POLICY REGARDING SETTLEMENT EXPANSION ACTIVITY AND THEFT OF PRIVATE PROPERTY**

1. Since 1968, numerous U.S. presidents and Department of State spokespersons have been very clear in pronouncing the official U.S. policy on Israel's 50-year military occupation, its duties as an occupier, and the daily violence brought on by the spectacular growth of settlements.

    (a) In 1969, almost 50 years ago, Charles Yost, U.S. Permanent Representative to the UN under the Nixon administration stated that: "An occupier [referring to Israel] may not confiscate or destroy private property," and "an occupier [like Israel] *must maintain the occupied territory as intact without interference with the customary life of the area.*"[1] The intentional, inhumane, systematic, and reckless destruction of homes, power grids, air ports, hospitals, and schools funded by U.S. tax-exempt entities like Defendants Hebron Fund and FIDF has completely destroyed the "customary life" that all Palestinians enjoyed before Israel's 48-year occupation started.

    (b) In 1980 Cyrus Vance, U.S. Secretary of State, stated: "United States Policy regarding settlements is unequivocal and has been a matter of longstanding record…settlements are illegal, and Article 49 paragraph 6 of the Geneva Convention is applicable," i.e., "all occupiers [like Israel] are bound to preserve

---

[1] U.S. Policy on the Illegality of Israeli Settlements under International Law, (excerpted from Ambassador Daniel Kurtzer, "Do Settlements Matter? An American Perspective," Middle East Policy, vol. 16, issue 3, fall 2009), J Street. Available at https://s3.amazonaws.com/s3.jstreet.org/images/One_Pager_Illegality_of_Settlements_under_Intl_Law.pdf, accessed December 8, 2015.

Case 1:16-cv-02288-RDM   Document 2-2   Filed 11/21/16   Page 2 of 6

private properties for the rightful owners"[2] and ensure that their customary life can go on as usual. 25 years later, Israeli Prosecutor Sasson, tasked by the Israeli government with preparing a report on illegal settlements, echoed that identical sentiment and recommended that: (1) criminal charges be filed against government officials for financing illegal settlements and outposts and issuing illicit construction permits; and (2) illegal settlements had to be evacuated, since they were built on private property owned either by the state or by Palestinians.[3]

(c) 30 years ago Secretary of State Vance had tasked U.S. State Department attorney Herbert J. Hansell to research the issue of the legality of the settlements. Attorney Hansell, much like Special Prosecutor Sasson and hundreds of other international legal scholars, concluded that they violated the terms of the Geneva Convention and contravened clearly-articulated American foreign policy objectives. That is conduct specifically prohibited by the recent legislation known as JASTA.

(d) In 1989 Thomas Pickering, Permanent U.S. Ambassador to the UN, stated that "Since the end of the 1967 war, the United States has regarded Israel as the occupying power in the Occupied Territories, which includes the West Bank, Gaza, EJ, and the Golan Heights[4]…Israel's occupation is governed by the Hague Convention of 1949 and the Hague Regulations of 1907."[5]

(e) In 1991, Secretary of State Baker testified on the Hill and condemned the settlements and declared that such criminal activity was a violation of U.S.

---

[2] http://www.cmep.org/content/us-statements-israeli-settlements_short, accessed December 8, 2015.
[3] Sasson Report, available at http://www.peacenow.org.il/eng/sites/default/files/Sasson_Report_EngSummary_0.pdf.
[4] http://www.cmep.org/content/us-statements-israeli-settlements_short.
[5] Id.

2

foreign policy. After hearing his testimony, Congressman Obey, chairman of the Subcommittee on Foreign Relations Affairs, agreed strongly that "this [settlement] activity is in violation of U.S. [foreign] policy." Thus, settlements violate U.S. foreign policy whether they are technically legal or not. Even if settlement advocates like Defendant Prime Minister Netanyahu, or U.S. pro-occupation tax-exempt officials claim that settlement expansion is legal, that is an irrelevant consideration. The reason is settlement expansion necessarily entails wholesale violence: arms trafficking, ethnic cleansing, murder, genocide, arson, theft of private property, and malicious property destruction. These are all notorious war crimes which have been recognized by both U.S. and Israeli government officials since the 1945 Nuremburg trial.

(f) In 1995, Treasury and U.S. President Bill Clinton, in Executive Order 12947, condemned individuals and entities who financed acts of violence in the Middle East. That Executive Order, authored by the Treasury Department, cited the need to protect national security, foreign policy, and the U.S. economy. These concerns are the identical concerns specified in the JASTA legislation referenced herein.

(g) Moreover, section 1(c) of Executive Order 12947 forbids any person from engaging in a transaction *within the U.S.* that either evades, avoids, or attempts to violate a provision set forth in the Order. Approximately 100 pro-occupation charities have been engaging in fundraising efforts, i.e. transactions in the U.S. which are designed to violate this order. And Provision 1(b) prohibits the Defendants named herein from providing financial support for violent acts occurring in the Middle East, especially acts of international terrorism.

(h) These U.S. based tax-exempt entities have, *inter alia*, intentionally financed the purchase of sophisticated military hardware [Kalashnikovs, percussion grenades, night vision goggles, sniper scopes,] which inevitably results in the promotion of further violence in the OPT. Because tax exempt entities like Friends of Israeli Defense Forces have directly funded the Israeli army's criminal activity[6], FIDF officials have encouraged and funded numerous acts of violence in the Middle East, such as arson, ethnic cleansing, genocide and torture.. Thus, they have engaged in criminal conduct that directly contravenes this Executive Order, and they therefore can be designated by Treasury as specially designated global terrorists.

(i) In 2001 the "Mitchell Report," officially the Sharm el-Sheikh Fact-Finding Committee Report (an international fact-finding committee led by former U.S. Senator George Mitchell) stated that "The U.S. government [has a] longstanding opposition to Israel's policies (displacement of the local Palestinian population) and procedures (IDF confiscation and demolition of homes) regarding settlements in the Occupied Territories." There are other pronouncements [too many to be listed here] which have similarly condemned settlement expansion, arms trafficking, wholesale violence, and ethnic cleansing [courtesy of the forced expulsion of the local Palestinian population.[7]]

---

[6] A recent example of that criminal activity is the murder of Uday Irshaid by IDF forces in Hebron on December 11, 2015. The 24-year-old Palestinian was shot and killed just six weeks after these same soldiers killed his sister Dania, 17 years old. Amnesty international has stated that the killing appeared to be a "summary execution." *See* http://www.maannews.com/Content.aspx?id=769295, accessed December 14, 2015.

[7] For example, "The Israel Lobby and U.S. Foreign Policy," John J. Mearsheimer and Stephen M. Walt, 2007 (hereinafter "Israel Lobby") p. 367. The U.S. also voted in favor of UN resolutions 672 and 681 in 1990 which criticize Israel's deportation of Palestinians.

    (j)  These pronouncements were made by U.S. presidents (Ford, Nixon, Kennedy, Bush I, Bush II, Clinton, and Obama), Senator Fulbright, State Department spokespersons like Richard Boucher, and Secretaries of State (Colin Powell, Condoleezza Rice, Hillary Clinton) and by former U.S. Ambassador to the UN Susan Rice. Even today, President Obama and State Department senior officials have been compelled to issue statements of similar condemnation, blaming Defendant Netanyahu for encouraging and financing the settlement enterprise and the demise of the two-state solution. As for the latter, he has authorized the annexation of the entire Jordan Valley based on "military necessity." The reason—as a result of that annexation, Palestinians will have no property left on which they could establish a separate Palestinian state.

2. To ensure that Israel's ministries, including Defendant IDM would comply with America's longstanding and emphatic anti-settlement public policy, U.S. officials, including former Secretary of State Baker, repeatedly requested and received verbal assurances from a number of Israeli prime ministers that the government would not use "state" property or spend U.S. aid in the OPT settlements.[8] Defendant Netanyahu and other Israeli government officials at his urging have repudiated these verbal agreements, and have allowed Israel based NGOs to continue soliciting funds on U.S. soil, which are used to continue financing the forcible expulsion of the local Palestinian population.

---

[8] In 1991, Prime Minister Yitzhak Shamir promised that any funds received by Israel from America would "not be used in any manner to expand existing settlements or create new settlements in the West Bank." See May 23, 1991 NYT Article "Baker See NYT article Tax-Exempt Funds Aiding West Bank Settlements. See also Arms Export Control Act of 1976 (AECA), 22 U.S.C. §2754 (aid must be solely for "internal security" and "legitimate self-defense"). *See also* Letter from Rep. Kucinich to Condoleezza Rice, Secretary of State, January 5 2009. (Citing the AECA, stating Israel's most recent attacks neither further internal security nor do they constitute "legitimate" acts of self-defense).

5

3. Courtesy of America's tax code, hundreds of Israeli based NGOs continue to receive millions of dollars every month from U.S. based tax exempt entities to fund settlement expansion, knowing that activity necessarily entails ethnic cleansing and further confiscation of private Palestinian property. This money-laundering scheme has become a significant problem—in 2007 Israeli based NGOs and the Israeli army received $1.7 billion in tax-exempt income from U.S. pro-occupation tax-exempt entities. The annual income transfer is now estimated to exceed $2 billion. It puts a tremendous strain on the U.S. economy and results in the Treasury Department being deprived of billions of dollars in tax revenues.

4. To sum up, for at least forty years, U.S. presidents, their Secretaries of State, and U.S. House of Representatives leadership have all condemned the criminal activity and settlement expansion that the U.S. based tax-exempt entities have been knowingly financing. The reason is that stealing thousands of acres of Palestinian property violates clearly-defined U.S. public policy and frustrates U.S. foreign policy objectives in the Middle East, i.e. the two state solution is no longer viable as a result. Frustrating U.S. foreign policy objectives is one of the major concerns that congressional leaders specifically addressed in the recently enacted JASTA legislation.