# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RICHARD SIEGEL, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF THE TREASURY, *et al.*, <br><br> *Defendants*. | Civil Action No. 16-2288 (RDM) |

## MEMORANDUM OPINION

This matter is before the Court on Defendants' Motion to Dismiss, Dkt. 24. Plaintiffs are twenty-eight individuals who object to various actions allegedly taken by Israel or Israeli citizens against Palestinians. They bring this case against the Department of Defense, the Department of the Treasury, and the Department of State, and those Departments' Secretaries in their official capacities. Plaintiffs argue that U.S. support—primarily in the form of foreign aid and charitable donations administered or facilitated by Defendants—has helped Israel commit various crimes against Palestinians and that continued aid violates an amalgam of international and domestic laws. They request that the Court "order agency defendants to stop providing any and all financial and military assistance to Israel." Dkt. 2 at 68. For the reasons explained below, the Court concludes that Plaintiffs lack Article III standing. The Court will, accordingly, **GRANT** Defendants' motion and will dismiss the complaint.

## I. BACKGROUND

Because this matter is before the Court on a motion to dismiss, the Court must "accept [Plaintiffs'] well-pleaded factual allegations as true and draw all reasonable inferences from

1

those allegations in . . . [P]laintiff[s'] favor." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).

The nub of Plaintiffs' claim is a "concern[] about the fact that . . . American aid dollars . . . are going to fund" Israel, which they allege is responsible for numerous harms to Palestinians. Dkt. 2 at 23 (Compl. ¶ 19). Primarily, Plaintiffs take issue with the $200 billion they say the United States "ha[s] given to Israel over the last thirty years." *Id.* at 9. They contend that this money has funded a "Master Plan" to colonize land owned by Palestinians, to "confiscate Palestinian homes," to "rid[] the West Bank and Jerusalem of all non-Jews," and to "permanently annex" Jerusalem and what Plaintiffs refer to as the "Occupied Palestinian Territory." *Id.* at 25, 26, 33 (Compl. ¶¶ 26, 28, 44). They argue that this "Master Plan" is abetted by U.S. "financial and military aid" and that withdrawing this aid would "exert pressure on Israel" to cease its unlawful activity. *Id.* at 26, 28 (Compl. ¶¶ 29, 33).

Plaintiffs also allege that, beyond this "Master Plan," Defendants' aid to Israel has facilitated "wholesale violence like arson, ethnic cleansing, arms trafficking, [and] the maiming and murdering of Palestinians living near illegal [Israeli] settlements." *Id.* at 39 (Compl. ¶ 56). The complaint enumerates a litany of offenses the Israeli army has purportedly committed and claims that "[w]ithout the $200 billion provided by [Defendants,] the Israeli armed forces . . . would have lacked sufficient funding to . . . commit these horrendous war crimes." *Id.* at 43–46 (Compl. ¶¶ 64–68). Of particular relevance to the pending motion, Plaintiffs allege that U.S. aid has helped support the confiscation of property belonging to Plaintiffs Ali Ali and Linda Kateeb; they allege that they "lost their private property" after it was "seized and [later] occupied by belligerent settlers who are protected by the Israeli army," which they argue was funded by U.S. aid dollars. *Id.* at 14–15 (Compl. ¶ 4). This seizure, moreover, was allegedly made

"without due process" and "[b]ecause of their national Palestinian heritage." *Id.* at 14, 17 (Compl. ¶¶ 4, 8).

Finally, Plaintiffs argue that the Defendants' decisions to continue to provide aid to Israel are arbitrary and capricious because they have "adopt[ed] a pro-Israel double standard and . . . [have] not adher[ed] to their own regulations which prohibit funding ethnic cleansing, genocide and the de-nationalization of a civilian population." *Id.* at 59; *see also id.* at 59–68 (Compl. ¶¶ 84–103). According to Plaintiffs, these actions are "obvious war crimes" that violate the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A). *Id.* at 59; *see also id.* at 24 (Compl. ¶ 22).

On the basis of these allegedly illegal actions, Plaintiffs seek an injunction "to stop [Defendants from] providing any and all financial and military assistance to Israel." *Id.* at 68. "Unless the [Defendants] deny further assistance to Israel," the Plaintiffs argue, Israeli settlers, "the Israeli army[,] and its Air Force will simply continue their thirty[-]year pattern of gross human rights abuses, including ethnic cleansing and genocide." *Id.* at 68–69.

## II. LEGAL STANDARD

"Article III of the Constitution limits the jurisdiction of federal courts to 'actual cases or controversies between proper litigants.'" *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014) (quoting *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 661 (D.C. Cir. 1996) (en banc)). "[D]efect[s]" in Article III standing, accordingly, constitute "defect[s] in subject matter jurisdiction." *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987). The "plaintiff bears the burden of . . . establishing the elements of standing," and each element "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Arpaio*, 797

3

F.3d at 19 (internal quotation marks omitted) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). As a result, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim [of standing] that is plausible on its face." *Id.* (alterations in original) (internal quotation marks omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "[T]hreadbare recitals of the elements of [standing], supported by mere conclusory statements, [will] not suffice," *id.* (second alteration in original) (quoting *Iqbal*, 556 U.S. at 678), and the Court need not "assume the truth of legal conclusions," nor must it "accept inferences that are unsupported by the facts set out in the complaint," *id.* (internal quotation marks omitted) (quoting *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007)).

Establishing standing requires a showing of three elements—injury in fact, causation, and redressability—which together constitute the "irreducible constitutional minimum of standing." *Lujan*, 504 U.S. at 560. On a motion to dismiss, the plaintiff must "sufficiently allege a 'concrete and particularized' injury that is 'fairly traceable to the challenged action of the defendant' and 'likely' to be 'redressed by a favorable decision.'" *West v. Lynch*, 845 F.3d 1228, 1230 (D.C. Cir. 2017) (quoting *Lujan*, 504 U.S. at 560–61). The first element, injury in fact, requires that a plaintiff show an "invasion of a legally protected interest which is . . . actual or imminent, not conjectural or hypothetical." *Arpaio*, 797 F.3d at 19 (quoting *Lujan*, 504 U.S. at 560–61). The second element, causation, demands a "causal connection between the injury and the conduct complained of" that is attributable to the defendant, "and not the result of the independent action of some third party not before the court." *Id.* (quoting *Lujan*, 504 U.S. at 560–61). The final element, redressability, requires that the injury be remediable "by a favorable decision." *Id.* (quoting *Lujan*, 504 U.S. at 560–61).

4

## III. ANALYSIS

Plaintiffs' theory of standing relies on two distinct groups of injuries. First, twenty-six of those bringing suit assert injuries based on their concerns as taxpayers about U.S. government decisions that purportedly facilitate Israeli actions detrimental to Palestinians. Second, Plaintiffs Kateeb and Ali allege that Israeli settlers took their property with the support of the Israeli military. The Court concludes that the former group lacks standing because it has failed to assert a sufficiently particularized and concrete injury in fact and that the latter group lacks standing because Kateeb and Ali have not adequately alleged either a sufficient causal link between the challenged actions and their injuries or that any deprivation of property they suffered would be redressable by a favorable decision. The Court discusses these defects in turn.

### A. Injury in Fact

The only injury the majority of the plaintiffs allege is their shared "concern[]" as "American taxpayers" that Defendants' conduct violates various laws, treaties, norms, and policies. These twenty-six plaintiffs argue that they are concerned about how U.S. foreign aid is used; whether that aid violates any "clear congressional mandates," the Constitution, or executive orders; whether the United States is supporting the commission of "war crimes;" and how the aid impacts America's "image . . . especially in the Muslim world and the Middle East," thereby potentially "encourag[ing] violent attacks on American citizens travelling or performing military services abroad." Dkt. 2 at 23–24, 27 (Compl. ¶¶ 19, 21, 29). None of these concerns amounts to an Article III injury.

To suffice for standing purposes, an injury must be particularized; that is, the plaintiff must be "affect[ed] . . . in a personal and individual way." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan*, 504 U.S. at 560 n.1). The Supreme Court has "consistently

held that a plaintiff raising only a generally available grievance about government," including an "interest in [the] proper application of the Constitution and laws, . . . does not state an Article III case or controversy." *Lujan*, 504 U.S. at 573–74. Such an injury is no greater than that suffered by the public at large and, therefore, is inadequately particularized. *Id.* at 574, 576–77. A plaintiff's status as a taxpayer, moreover, cannot transform such a generalized grievance about compliance with the law into a particularized injury. *See Frothingham v. Mellon*, 262 U.S. 447, 486–87 (1923); *see also Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 593 (2007). Any harm that could arise from one's status as a taxpayer is "shared with millions of others, is comparatively minute and indeterminable, and the effect [of granting relief] upon future taxation . . . [is] so remote, fluctuating[,] and uncertain" that the Court has no constitutional basis for intervention.[1] *Frothingham*, 262 U.S. at 487. Because Plaintiffs have failed to allege any injury beyond generalized "concerns" about the enforcement of the law—a theory of injury that has been thoroughly rejected by the Supreme Court—they have not carried their burden of establishing standing, even at this early stage of the litigation.

      Plaintiffs' arguments to the contrary lack merit. First, they suggest that being "concerned and knowledgeable" about the conduct purportedly facilitated by the government actions at issue and "know[ing]" that the U.S. government is acting in violation of various bodies of law distinguish their claims from those of the typical citizen or taxpayer. Dkt. 2 at 23–24 (Compl. ¶¶ 20–21). Standing to sue, however, "is not measured by the intensity of the litigant's interest or the fervor of his advocacy." *Valley Forge Christian Coll. v. Ams. United for Separation of*

---

[1] A narrow exception to this rule concerns Establishment Clause challenges to congressional appropriations made under the Taxing and Spending Clause, *see Flast v. Cohen*, 392 U.S. 83, 102–04 (1968); *see also In re Navy Chaplaincy*, 534 F.3d 756, 760–61 (D.C. Cir. 2008), but Plaintiffs do not seek relief under such a theory.

*Church & State, Inc.*, 454 U.S. 464, 486 (1982). The knowledge and familiarity alleged by Plaintiffs is the sort of merely "psychological consequence . . . produced by observ[ing] . . . conduct with which one disagrees" that cannot suffice for standing, no matter how vehement or sincere. *Id.* at 485.

Second, Plaintiffs' concern about the effect U.S. aid has on the country's "image" abroad, *see* Dkt. 2 at 23 (Compl. ¶ 19), is still—as currently formulated—a generalized grievance about the wisdom of governmental actions or policies. Once again, Plaintiffs' allegations contain no detail about how they have been personally and concretely affected. It is conceivable that, in unique circumstances, an increased risk of harm from attacks abroad might yield a concrete and particularized injury, but the complaint does not come close to alleging such an injury. *See id.* (Compl. ¶ 19). Such a "fear arising from a foreign policy, no matter how severe a plaintiff's disagreement with that foreign policy may be, cannot constitute injury[ ]in[ ]fact without a concrete harm." *Bernstein v. Kerry*, 962 F. Supp. 2d 122, 127–30 (D.D.C. 2013), *aff'd*, 584 F. App'x 7 (D.C. Cir. 2014); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013) (concluding that a "subjective fear of surveillance does not give rise to standing").

Finally, Plaintiffs argue that they have suffered a cognizable injury because the APA creates a cause of action for those "adversely affected or aggrieved by agency action," Dkt. 25 at 7; *see* 5 U.S.C. § 702, and "there is no other avenue for them to seek relief," Dkt. 25 at 8. With respect to the former theory of injury, even assuming for the sake of argument that the APA creates a statutory right to bring claims predicated on violations of the sources of law relied on by Plaintiffs—which include the "Law of Nations" and various "mandates" set forth by government policy statements—the existence of a cause of action is distinct from the establishment of standing. *See Bond v. United States*, 564 U.S. 211, 218 (2011); *Steel Co. v.*

7

*Citizens for a Better Env't*, 523 U.S. 83, 91–93 (1998). "Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo*, 136 S. Ct. at 1549. Nor does Plaintiffs' assertion that "there is no other avenue for them to seek relief," Dkt. 25 at 8, add to their claim to standing. As the Supreme Court opined in *Clapper v. Amnesty International USA*, the contention that "if respondents have no standing to sue, no one would have standing, is not a reason to find standing." 568 U.S. at 420 (quoting *Valley Forge Christian Coll.*, 454 U.S. 464, 489 (1982)). The Court, accordingly, concludes that most of the Plaintiffs have failed to allege facts sufficient to state an injury in fact.

Plaintiffs are on firmer ground, however, in arguing that Ali Ali and Linda Kateeb have suffered an injury in fact. In particular, Plaintiffs allege that both Ali and Kateeb "lost their private property" after it was "seized and [later] occupied by belligerent settlers who are protected by the Israeli army," an army funded in part by U.S. aid dollars. Dkt. 2 at 14–15 (Compl. ¶ 4). This seizure, Plaintiffs say, was made "without due process" and "[b]ecause of their national Palestinian heritage." *Id.* at 14, 17 (Compl. ¶¶ 4, 8). The deprivation of property, even when that property is held abroad, constitutes a concrete and particularized injury in fact. *See Cardenas v. Smith*, 733 F.2d 909, 913 (D.C. Cir. 1984). The Court, accordingly, turns to whether Ali and Kateeb have carried their burden with respect to the remaining two elements of Article III standing.

**B.     Causation and Redressability**

Despite having alleged an injury in fact, Ali and Kateeb nevertheless lack standing because the causal link between Defendants' actions in providing or facilitating foreign aid and other assistance to Israel and Plaintiffs' injury is too attenuated. For substantially the same reasons, moreover, Plaintiffs have not carried their burden with respect to redressability. The

8

Court considers these elements together because when, "as in this case, a plaintiff's asserted injury arises from the government's allegedly unlawful" behavior directed at "someone else, . . . causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well." *Lujan*, 504 U.S. at 562. Indeed, "[c]ausation and redressability typically 'overlap as two sides of a causation coin,'" because "[a]fter all, if a government action causes an injury, enjoining the action usually will redress that injury." *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 n.1 (D.C. Cir. 2017) (quoting *Dynalantic Corp. v. Dep't of Defense*, 115 F.3d 1012, 1017 (D.C. Cir. 1997)).

Ali and Kateeb allege that their property was "illegally confiscated and [is] now occupied by belligerent settlers." Dkt. 2 at 23 (Compl. ¶ 20). The settlements in which those persons reside, Plaintiffs assert, were "funded by [U.S.] taxpayers for at least thirty years with million dollar contributions going to U.S. based pro-occupation tax exempt entities." *Id.* at 15 (Compl. ¶ 4). They argue that the seizure of their property cannot be remedied without an injunction barring Defendants from "providing any and all financial and military assistance to Israel," *id.* at 68, because the Israeli settlers who confiscated Ali's and Kateeb's property cannot "be evicted from that private property" due to the protection of "Israeli army personnel . . . financed by the American taxpayers," *id.* at 23 (Compl. ¶ 20). In the absence of U.S. aid, those military "personnel would be unable to maintain and support the settlements that encompass Plaintiffs' stolen land." Dkt. 25 at 9–10. Plaintiffs do not allege that the Israeli military or the settlements in question are exclusively funded by sources controlled by Defendants, but rather that those sources "augment [the] limited financial resources" of the Israeli army and Israeli settlers. Dkt. 2 at 46 (Compl. ¶¶ 68).

The financial support that Kateeb and Ali reference allegedly stems from both "the U.S. Treasury Department's failure to enforce its own tax-exempt regulations"[2] and direct aid from the U.S. government. *Id.* at 16–17 (Compl. ¶ 8). The Court has already rejected the former theory of standing on causation and redressability grounds in a similar case brought by many of the same plaintiffs, and the Court need not rehash its earlier holding. *See Abulhawa v. U.S. Dep't of the Treasury*, 239 F. Supp. 3d 24, 33–37 (D.D.C. 2017); *see also id.* at 29, 33 (describing Kateeb's claim of deprivation of property without due process of law). Suffice it to say that, "where a party is seeking simply to remove a third party's entitlement to a tax exemption, the exemption likely will not bear sufficient links of traceability . . . to the alleged injury to warrant standing under *Allen v. Wright*[,] [468 U.S. 737 (1984)]." *Fulani v. Brady*, 935 F.2d 1324, 1328 (D.C. Cir. 1991). Plaintiffs have not demonstrated that the theory of standing advanced in *Abulhawa* and repeated here falls outside this general rule.

The allegations advanced for the first time in this case, which focus on U.S. foreign aid, fare no better. To establish that the purely prospective injunctive relief sought by Plaintiffs would redress their alleged injuries requires some version of the following chain of reasoning: (1) Defendants directly or indirectly distribute aid to the Israeli military or Israeli settlers; (2)

---

[2] Plaintiffs at various times describe this failure as both the "approv[al] and allow[ance] [of] $2 billion in illegal tax deductions to fund belligerent settlers and Israeli army personnel on an annual basis," *see, e.g.*, Dkt. 2 at 65 (Compl. ¶ 97), and the Department's purported decision not to enforce its regulations regarding what charitable organizations should be tax-exempt, *see, e.g.*, *id.* at 13 (Compl. ¶ 1). The Court's reasoning in *Abulhawa v. U.S. Dep't of the Treasury*, 239 F. Supp. 3d 24 (D.D.C. 2017), forecloses either theory. Regardless of whether the money sent to Israel comes from tax-exempt organizations or from individual donors who take tax deductions, the same, too-attenuated chain of causation is necessary to link Defendants' actions to the deprivation of Plaintiffs' property. *See id.* at 34. The Court held in *Abulhawa* that "[a]t each of the[] links" in that causal chain, "a third-party actor could break the . . . chain." *Id.* The same is true here, because, to give just two examples, "a donor might decide to donate" for reasons other than tax consequences, or "other donors might take the place of any donors who will contribute only" for tax reasons. *See id.*

those recipients directly or indirectly use that assistance to aid those who actually confiscated Ali's and Kateeb's property; (3) the Israeli military or the settlers would stop assisting those who actually confiscated Ali's and Kateeb's property if Defendants' conduct were enjoined; (4) in the absence of that assistance, those who actually confiscated Ali's and Kateeb's property would find no other source of assistance and would be forced to abandon the confiscated property; and (5) that property would then be returned to Ali and Kateeb. This chain of reasoning is too remote and too speculative for several reasons.

First, the complaint vaguely refers to the "direct and indirect" provision of aid to often-unidentified entities, requiring that the Court speculate about the actual path of the funds, the various intermediate steps, the ultimate recipients, and their relationship to the control of Plaintiffs' property. The complaint also makes no effort to identify the specific source of the funds that are allegedly being used to prevent Ali and Kateeb from recovering their property, whether those funds are administered by any of the Defendant agencies, and whether those agencies have any discretion to withhold the funds.

Second, as in *Abulhawa*, this is not a case in which Defendants confiscated or currently hold Ali's and Kateeb's property. Instead, Plaintiffs allege that third parties assisted (or indirectly assisted) by Defendants were responsible for confiscating the property and that enjoining U.S. aid would mean that "settlers and Israeli army personnel would be unable to maintain and support the settlements that encompass Plaintiffs' stolen land." Dkt. 25 at 9–10. Plaintiffs' injury and any relief from that injury, accordingly, ultimately flow from the responses of third parties to Defendants' actions. Such "reliance on the anticipated action[s] of unrelated third parties makes it considerably harder to show the causation required to support standing." *Arpaio*, 797 F.3d at 20. "Although 'standing is not precluded' in a case that turns on third-party

conduct, 'it is ordinarily substantially more difficult to establish,'" *id.* (quoting *Lujan*, 504 U.S. at 562), and the D.C. Circuit "ha[s] required 'substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation,'" *id.* (quoting *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 941 (D.C. Cir. 2004)). Similarly, "[r]edressability examines whether the relief sought, assuming that the court chooses to grant it, w[ould] likely alleviate the particularized injury alleged by the plaintiff." *West*, 845 F.3d at 1235 (quoting *Fla. Audubon Soc'y*, 94 F.3d at 663–64). "The key word is 'likely,'" *id.* (quoting *Lujan*, 504 U.S. at 561), and thus "the prospect of obtaining relief from the injury as a result of a favorable ruling" cannot be "too speculative," *Allen*, 468 U.S. at 752. As with causation, when redressability "depends on the unfettered choices made by independent actors not before the court[ ] and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict, it becomes substantially more difficult to establish standing." *Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 50 (D.C. Cir. 2016) (internal quotation marks omitted) (quoting *Lujan*, 504 U.S. at 562). "Courts do not lightly speculate how independent actors not before them might" act, and "[w]hen conjecture is necessary, redressability is lacking." *West*, 845 F.3d at 1237 (internal quotation marks and alterations omitted).

Third, Plaintiffs' allegation that "the Israeli settlements are completely dependent for their survival and growth on funds received from the Defendant agencies," Dkt. 25 at 8, is too conclusory to sustain standing, and it is at odds with Plaintiffs' own allegations. Most notably, Plaintiffs describe *two* sources of assistance as contributing to the deprivation of their property: direct aid from the U.S. government and contributions from private individuals (made either directly or through charitable organizations). Although Plaintiffs at times state that the seizure of

12

their property could not continue in the absence of direct government support, they elsewhere allege that a key ingredient in aggression against Palestinians, including Ali and Kateeb, has in fact been private contributions that support the efforts of "violent militia members" to do things like "acquire Kalashnikovs, sniper scopes, percussion grenades, guard dogs, [and] night vision goggles." Dkt. 2 at 65 (Compl. ¶ 97). Plaintiffs' own allegations thus contradict the notion that the deprivation of Ali's and Kateeb's property is "completely dependent" on the government's direct assistance.

Fourth, Ali's and Kateeb's alleged injury is the seizure of their property by Israeli settlers, who were allegedly abetted by Israeli military personnel, but they seek only prospective injunctive relief. Thus, to allege standing, they must allege facts—and not merely conclusions—sufficient to establish that the settlements would "likely" be abandoned, and the property would "likely" be returned to Ali and Kateeb, if U.S. aid to Israel were curtailed. *See Owner–Operator Indep. Drivers Ass'n, Inc. v. U.S. Dep't of Transp.*, 879 F.3d 339, 346 (D.C. Cir. 2018) (holding that plaintiffs seeking only prospective injunctive relief must prove an injury that is "continuing" or "imminen[t]"); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) (requiring that a plaintiff show "a sufficient likelihood that he will again be wronged in a similar way" to establish standing to seek prospective injunctive relief). The path from ending U.S. aid to the return of Ali's and Kateeb's property, however, "involves numerous third parties," including the Israeli government, Israeli military commanders, and the settlers themselves. *See Allen*, 468 U.S. at 759. The "independent decisions" that would be made by those parties in the absence of Defendants' financial and military assistance are "sufficiently uncertain to break the chain of causation between the [P]laintiffs' injury and the challenged [g]overnment action." *Id.* The complaint's lengthy recitation of the fraught diplomatic, political, and religious issues

13

surrounding the territory in which Plaintiffs' property was purportedly seized only further demonstrates that numerous factors beyond the availability of U.S. aid play a role in the decisions of settlers and the Israeli military. Federal courts, moreover, are not well-suited to draw the types of inferences regarding foreign affairs and international responses to U.S. policy that Plaintiffs' theory of causation posits. *See Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) ("[T]he historical gloss on the 'executive Power' vested in Article II of the Constitution has recognized the President's 'vast share of responsibility for the conduct of our foreign relations.'" (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610–11 (1952) (Frankfurter, J., concurring))); *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918) ("The conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative—'the political'—departments of the government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision."); *Alperin v. Vatican Bank*, 410 F.3d 532, 549 (9th Cir. 2005) ("[T]he management of foreign affairs predominantly falls within the sphere of the political branches . . . .").

Plaintiffs ultimately ask the court to "pile conjecture on conjecture," *West*, 845 F.3d at 1237, and to reduce the complex decisions surrounding Israeli activity in the territory at issue to a single determinative variable. As this Court has previously explained, "[s]uch 'unadorned speculation as to the existence of a relationship between the challenged government action and the third-party conduct will not suffice to invoke the federal judicial power.'" *Abulhawa*, 239 F. Supp. 3d at 37 (quoting *Scenic Am.*, 836 F.3d at 50). For these reasons, the Court concludes that the chain of causation and theory of redressability on which Plaintiffs rely are too attenuated and depend too heavily on the independent actions of third parties to establish Article III standing.

Accordingly, Plaintiffs fail to carry their burden of establishing the causation and redressability elements of standing, even at this early stage of litigation. *See id.* at 35.

## CONCLUSION

For these reasons, Plaintiffs lack Article III standing. The Court will, accordingly, **GRANT** Defendants' motion to dismiss Plaintiffs' complaint, Dkt. 24.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: March 28, 2018